CITY OF NOME et al., Appellants,

v.

Samuel P. AILAK and Viola
Ailak, Appellees.

No. 3137.

Supreme Court of Alaska.

Sept. 23, 1977.

Clifford W. Holst and Phillip J. Eide, Guess & Rudd, Anchorage, for appellants.

C. R. Kennelly, of Kennelly & Azar, Anchorage, for appellees.

Before BOOCHEVER, C. J., RABINOWITZ, CONNOR and BURKE, JJ., and DIMOND, J. Pro Tem.

## OPINION

DIMOND, Justice Pro Tem.

A jury awarded Mr. and Mrs. Samuel Ailak a verdict against the City of Nome (hereafter "the City") and certain City police officers, as follows: $45,000.00 for false arrest, $45,000.00 for false imprisonment, and $10,000.00 for trespass. These were compensatory damages; no punitive damages were awarded.

### TRESPASS

Samuel Ailak was stopped outside his home in connection with an investigation by City police officers of a reported rape and murder. A man named Encelewski, who had called the police to report that those crimes had occurred, was standing near Ailak when the officers arrived. When Encelewski was asked about the murder, he pointed to the Ailak residence, saying: "The body's in there."

Chief of Police Kennedy entered the Ailak residence without knocking and without requesting permission to enter.[1] When

---

1. Conflicting testimony was heard at trial on the issue of whether the door to the residence was slightly ajar or closed just before Kennedy's entry. In any case, Kennedy indicated

Kennedy entered, he found a group of people sitting in the Ailak home drinking coffee. They were asked where the body was, and they told Kennedy that there was no body. They explained that "a crazy girl" had tried to get them to let her into the house, but they had not let her in. The officers then left the Ailak residence. This occurrence was the basis for the damages awarded to the Ailaks for trespass by the City.

The City contends that police officers may assert as a defense to an action for trespass that they are privileged to enter a citizen's home without permission and without a warrant in certain emergency situations, and that the trial court erred in not so instructing in this case. Alternatively, the City argues that the trial court should have ruled as a matter of law that the entry into the Ailak residence was privileged.

In response, the Ailaks first assert that the City did not properly object to the trespass instruction given by the trial court,[2] and therefore, the issue may not be raised on appeal unless the instruction represents plain error. Second, the Ailaks assert that the entry in this case was not privileged.

■ The City has submitted an affidavit which indicates that its trial attorney did not specifically object to the general instruction on trespass given by the trial court because the trial judge had indicated to counsel that a blanket exception would be taken to all instructions offered by either party, but not given by the court.[3] This assurance was apparently given off

the record.[4] However, the Ailaks do not dispute the City's assertion that the judge assured the parties that a "blanket exception" would be taken as to all proposed instructions not given by the court. Therefore, we shall consider the propriety of the instruction given on the issue of trespass.

In *Stevens v. State*, 443 P.2d 600, 602 (Alaska 1968), *cert. denied*, 393 U.S. 1039, 89 S.Ct. 662, 21 L.Ed.2d 586 (1969), we recognized that police officers have a right to enter buildings without a warrant in an emergency as an inherent part of their common law duties. Justice Rabinowitz in his concurrence noted that:

[a] search warrant is not required to legalize an entry by police for the purpose of bringing emergency aid to an injured person. Frequently, the report of a death proves inaccurate and a spark of life remains sufficient to respond to emergency police aid. As a general rule, we think, an emergency may be said to exist, within the meaning of the 'exigency' rule, whenever the police have credible information that an unnatural death has, or may have occurred.[5]

■ Although the *Stevens* case dealt with the issue of whether a warrant was necessary, the concerns expressed by Justice Rabinowitz seem to apply as well to the issue of whether police officers should be civilly liable for trespass as a result of their unauthorized entry into a home. We have already recognized in the context of a different type of civil case that police officers are under a duty to go to the aid of imperiled citizens.[6] This being the case, officers

---

that even if the door was closed, the officers would have entered the Ailak residence because the officers "were investigating in an emergency."

2. Jury Instruction 31 provided:
A trespass is an entry upon the real estate of another without the permission or invitation of the person lawfully entitled to possession thereof.

3. The City proposed the following instruction: The right of the police to enter and investigate a building in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their

duties as police officers and derives from a common law [sic].

4. We disapprove of off-the-record discussions between court and counsel concerning jury instructions. Such a practice makes our job needlessly more difficult. *See State v. Abraham*, 566 P.2d 267, Opn. No. 1438, pp. 5–6 (Alaska, June 8, 1977); *State v. Buckalew*, 561 P.2d 289, 293 (Alaska 1977).

5. 443 P.2d at 605, quoting *Patrick v. State*, 227 A.2d 486, 489 (Del.1967).

6. *Lee v. State*, 490 P.2d 1206 (Alaska 1971).

must be protected against civil liability if in the course of carrying out their duty to aid imperiled citizens, they enter buildings without the owners' authorization.

 In *Stevens*, we held that it is "the reasonableness of the belief of the police as to the existence of an emergency, not the existence of an emergency in fact" which is crucial in evaluating the actions of the police.[7] In this case, the officers had been told there was a body in the Ailak home. As Justice Rabinowitz pointed out in *Stevens*, reports of deaths are not always accurate and police officers should be encouraged to check out such reports as quickly as possible in case "a spark of life remains." We believe that the officers in this case had a reasonable belief as to the existence of an emergency which justified their unauthorized entry into the Ailak residence. Therefore, we hold that as a matter of law, the entry was privileged and the trial court erred in submitting the trespass count to the jury.[8]

It follows, then, that the Ailaks are entitled to no award of damages on the trespass claim, and therefore the sum of $10,000.00 must be deducted from their award.

## FALSE ARREST—FALSE IMPRISONMENT

As we stated earlier, the jury awarded damages of $45,000.00 for Ailak's false arrest, and another $45,000.00 for his being falsely imprisoned. The facts pertinent to these awards follow.

7. 443 P.2d at 602.

8. In *Stevens*, the police officers knocked before entering. Similarly, in *United States v. Barone*, 330 F.2d 543 (2d Cir.), *cert. denied*, 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053 (1964), the most frequently cited case on point, the officers, who entered because they heard screams, knocked before entering. The officers in this case did not knock before entering. Although we urge police officers to knock before entering even in emergency situations unless they have reason to believe that notice of entry will worsen the emergency, we do not believe that the failure to knock before the entry in this case cost appellants their privilege.

By our decision in this case, which involves a civil action in tort for trespass, we do not

## FACTS

When the police officers answered Encelewski's call, they observed a young woman, later identified as Linda Armstrong, standing a few feet from Encelewski. The officers observed Ms. Armstrong waving and motioning as they approached her. As the officers approached in their vehicle, Armstrong began to run away from where Ailak and Encelewski stood. The officers followed Armstrong, driving past Encelewski and Ailak. She ran between two buildings and disappeared. At this point, Chief Kennedy instructed Officer Michaels, who was driving the police vehicle, to return to where Encelewski and Ailak stood.

When the officers reached Encelewski and Ailak, they got out of the car. Encelewski stated to the officers, "He's the one. The girl said he raped her." After Kennedy had gone into the Ailak house and discovered there had been no murder, he returned to where Encelewski and Ailak stood and proceeded to question them. Kennedy asked Encelewski what he had observed. Encelewski told Kennedy that the woman said Ailak had raped her. Kennedy asked Ailak if that was true, and Ailak shook his head indicating that it was not. Ailak was asked if he knew what the girl looked like, and because he indicated that he did, Ailak was brought along with the officers on their search for Linda Armstrong.[9]

Before Ailak got into the police vehicle, Officer Buccilli frisked him. Buccilli found

decide whether similar conduct by police officers would justify a search without a warrant in a criminal case. *See Schraff v. State*, 544 P.2d 834, 841–44 (Alaska 1975).

9. In his deposition, which was read into evidence at trial, Kennedy stated: "We asked him if he would come with us and help us find her, and—which he agreed." Michaels testified simply that "Kennedy indicated Mr. Ailak and said that he was coming with us to find the girl." When asked what he thought the officers were doing when they put him into the police vehicle, Ailak testified that he thought they were arresting him. Further he testified explicitly that he did not want to get into the police vehicle. The verdict indicates that the jury believed Ailak rather than Kennedy.

two containers on Ailak's person and gave them to Michaels. The containers held pills for Ailak's heart condition.

The officers began to search for Armstrong, heading first to the point where they had last seen her. As they neared that point, Armstrong came out from between the two buildings between which she had earlier disappeared. The officers began to question Armstrong. She was distraught and appeared drunk. She cried, and she began talking about having killed her brother. When asked if Ailak had raped her, Armstrong alternatively indicated that he had and that he had not. She continued to interject comments about having murdered her brother.

After questioning Armstrong, the officers concluded that she had not been raped, and they released Ailak from the police vehicle. The officers returned Ailak's pills to him. Michaels thanked Ailak and apologized for any inconvenience. Ailak admitted that the officers had been polite to him.

The length of time Ailak was detained in the police vehicle was in dispute at trial. Michaels testified that it was no more than five minutes. Kennedy estimated that it was two to three minutes. Ailak testified that it was an hour or less. He also testified that he considered himself to be under arrest and that he went with the officers to keep from exciting his heart condition.

When Ailak returned home after his release, he apparently just sat around the house and acted upset. He did not feel it necessary to take any of his heart pills, however. His eating and sleeping habits were disrupted by the incident. Since Ailak was retired and his predominant activities were recreational, his life-style does not appear to have been disrupted severely by the incident nor was he prevented from working by it. Ailak testified at trial that he was embarrassed by the incident and that at the time of trial, ten months after the incident, the incident still bothered him.

He also testified, however, that he felt that once it was over, he would be able to forget it.

After the incident, Ailak's family arranged for Ailak to see a psychiatrist, Dr. Leo Ingle, who gave the only medical testimony presented at trial. Ingle did not see Ailak until eight months after the incident, several months after the complaint herein was filed.

Ingle, who had only seen Ailak for one or two office visits, testified that Ailak was suffering from reactive depression. Ingle further testified that Ailak was, as a result, retarded in his thought processes. Ingle found that Ailak's depression was caused by his April encounter with the Nome police. Ingle testified that Ailak would never be able to eliminate the incident from his mind and that he would continue to have personality problems even though the depression would cease and its physical consequences would disappear within six months.

## DUPLICATE AWARDS

 False arrest and false imprisonment are not separate torts. A false arrest is one way to commit false imprisonment; since an arrest involves restraint, it always involves imprisonment.[10] Even if, as appellees claim, the appellants did not object to submission of the case to the jury on separate counts without an instruction that the two counts were mutually exclusive, it was plain error to have so submitted this case.[11] It is obvious that the jury was misled by the lack of such an instruction to follow an erroneous theory which resulted in a double award for the appellees. Therefore, the amount of $45,000.00, in addition to the $10,000.00 allowed by the jury for trespass, must be deducted from the total award of $100,000.00.

The remaining contentions of error asserted by the City will now be considered.

**10.** Witkin, Summary of California Law § 214, at 2499 (8th Ed. 1974), citing *Moore v. San Francisco*, 5 Cal.App.3d 728, 85 Cal.Rptr. 281 (1970).

**11.** *See* cases cited in notes 20–22, *infra*.

### 1. *Arrest—Probable Cause.*

The City contends that Ailak was not in fact arrested, but was subjected only to reasonable detention as part of an investigation of a reported crime. It is the City's position that the trial court erred in not instructing the jury that police officers, under certain circumstances, have the right to stop citizens, short of making an actual arrest, in order to investigate reported crimes. AS 12.25.050 provides:

> An arrest is made by the actual restraint of a person or by his submission to the custody of the person making the arrest.

Conflicting testimony was presented as to whether Ailak was arrested. Ailak testified that he considered himself to be under arrest, but the police officers testified that he was not. Whether Ailak was in fact arrested is to be determined by an objective standard.[12] The facts are that Ailak was placed by the police in the back of a police vehicle which had no handles on the inside of the back doors in order to prevent escape by occupants in the rear seat. The verdict indicates that the jury concluded that Ailak did not enter the vehicle voluntarily. We conclude that there was sufficient evidence from which the jury could have properly found that Ailak was put under "actual restraint" within the meaning of AS 12.25.050 and that he was in fact arrested.

The next question is whether the arrest was lawful. The permissible grounds for arresting a person without a warrant appear in AS 12.25.030, which provides:

> *Grounds for arrest by private person or peace officer without warrant.* A private person or a peace officer without a warrant may arrest a person
>
> (1) for a crime committed or attempted in his presence;
> (2) when the person has committed a felony, although not in his presence;
> (3) when a felony in fact has been committed and he has reasonable cause for believing the person to have committed it.

In *McCoy v. State*, 491 P.2d 127, 130 (Alaska 1971), we stated that AS 12.25.030(3), which is the subsection applicable to this case, "must be given a reasonable construction." We held that under that subsection,

> a peace officer, without a warrant, may arrest a person for a felony when the officer has probable cause to believe that a felony has been committed and probable cause to believe that the person committed it.[13]

The City contends that the trial judge erroneously instructed the jury as to what would have constituted probable cause to arrest Ailak. It asserts that Instruction 36[14] told the jury that if it found that Ailak had not voluntarily entered the police vehicle, it would have to find for the Ailaks. The City argues that if the officers had probable cause to arrest Ailak, the jury should have found for the City even if Ailak did not voluntarily enter the police vehicle.

While the latter is a true statement of the law, Jury Instruction 36 did not omit this concept. Instruction 36 told the jury that if it believed the Ailaks' testimony, there would be no probable cause for Ai-

---

**12.** See *Richardson v. State*, 563 P.2d 266, 268 and n.2 (Alaska 1977).

**13.** 491 P.2d at 130 (footnote omitted). *See also Erickson v. State*, 507 P.2d 508, 517 (Alaska 1973).

**14.** Jury Instruction 36 provided:

> On the issue of false arrest and false imprisonment, if you find from all of the evidence in this case that the testimony of the Plaintiffs, Mr. and Mrs. Ailak, were [sic] true, then you must find that there was not probable cause or reasonable grounds for proper detention of Mr. Ailak. If you find the testimony of Mr. and Mrs. Ailak true, you are finding from the evidence that there was no probable cause that the crime of murder or rape was committed, or, that there was not strong suspicion or probable cause to believe that Mr. Ailak was guilty of murder or rape, and if you did not find Mr. Ailak freely and voluntarily entered the officers' car and go [sic] with them, then you must find for the plaintiffs on these issues.

> Jury Instruction 37 provided in similar form that if the testimony of the arresting officers was believed, then the jury had to find that the officers had probable cause to detain Ailak.

lak's detention, and if the jury further found that Ailak did not voluntarily enter the police vehicle, then the jury would have to find for the Ailaks. The instruction clearly required the jury to find both an involuntary entry and an absence of probable cause before a finding for the Ailaks would be mandated. The instruction did not direct the jury to find for the Ailaks solely on the basis of a finding of involuntary entry into the police vehicle.

■■■■■■ The instruction did, however, mistakenly direct the jury that if it believed the testimony of the Ailaks, there was no probable cause for Ailak's detention. The only facts in dispute in this case were the length of time Ailak was detained, whether the door to the Ailak residence was open or closed at the time of the officers' entry, whether Ailak voluntarily entered the police vehicle, and the extent of the incident's impact on Ailak. None of these matters is relevant to a determination of whether the officers had probable cause to arrest Ailak.

Since there were no disputes of fact relevant to the determination of whether the officers had probable cause to arrest, the trial court should have made that determination as a legal matter, applying the standard announced by this court in *McCoy v. State*, 491 P.2d 127, 130 (Alaska 1971). However, since the verdict makes clear that the jury concluded that the officers did not have probable cause to arrest Ailak and since we conclude that *McCoy* dictates the same conclusion, the error did not prejudice appellants.

Further, in *Erickson v. State*, 507 P.2d 508 (Alaska 1973), we affirmed the holding we had made in *McCoy, supra*. In *Erickson*, we stated:

A police officer is usually authorized to arrest without a warrant if he has probable cause to believe a felony has been committed and a reasonable belief that the person to be arrested is the one who committed it.[15]

In addition, we stated that probable cause cannot be established solely on the basis of a good faith belief on the part of the officer that there is probable cause to arrest. In order to establish probable cause, there must exist facts and circumstances known to the officer which would warrant a prudent person in believing that an offense has been or is being committed.[16]

Probable cause may rest on reasonably trustworthy information from an informant. If the informant is a cooperative citizen rather than an informant from the criminal milieu, his or her reliability need not be established before the arrest. However, some of the details of the information given by the informant must be verified before the arrest.[17]

The officers in this case obtained all of their pre-detention information from Encelewski, a citizen informant. However, Encelewski indicated to the officers that the information he provided was hearsay obtained from Armstrong, whose only contact with the officers at that point had been to run away from them. While it is true that the officers' independent observations included seeing a woman's parka near Ailak, the alleged rapist, and seeing a distraught woman, the officers also observed that the woman, not Ailak, ran from them, and that Ailak waited patiently for his encounter with the police.

The officers did not, before detaining Ailak, verify the details of the information given by the informant. Therefore, as a matter of law, the officers were without probable cause to arrest Ailak, and the erroneous jury instruction, which led the jury to conclude that the officers were without probable cause, did not prejudice appellants.

---

15. 507 P.2d at 517 (footnotes omitted).

16. *Id.*, citing *Soolook v. State*, 447 P.2d 55, 65 (Alaska 1968), *cert. denied*, 396 U.S. 850, 90 S.Ct. 107, 24 L.Ed.2d 99 (1969).

17. *Id.* 507 P.2d at 517–518. *See also Keller v. State*, 543 P.2d 1211, 1215 (Alaska 1975). *Cf. Aguilar v. Texas*, 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

### 2. Arrest—Reasonable Good Faith Belief.

 Late in the presentation of this appeal, the City advanced a previously unargued point which it argues is dispositive of this issue.[18] The City contends that the entire case has to this point been decided on an erroneous theory of law. It maintains that even if police officers make an arrest when they are without probable cause to do so, they are not civilly liable for the torts of false arrest and false imprisonment so long as they had a reasonable good faith belief in the legality of their conduct. Further, the City asserts that its objections at trial and in its briefs to the probable cause instructions were sufficient to avoid the bar against assigning as error the failure to give a jury instruction which has not been proposed to the trial court.[19] In addition, the City contends that in any case, the "plain error" doctrine necessitates consideration of this issue.

We will not ordinarily pass upon an assertion that the failure to give an instruction was error where the matter has not been properly brought to the attention of the trial court.[20] We will consider plain errors, even though not objected to below, which are "so substantial as to result in injustice."[21] However, only where an erroneous instruction creates "a high likelihood that the jury followed an erroneous theory resulting in a miscarriage of justice" will this court apply the "plain error" rule in a civil case.[22] Jury instructions which set forth an entirely erroneous standard of liability would normally be considered to create such a high likelihood. On the facts of the case at bar, however, application of the instruction sought by appellant would not have altered the result. Accordingly, we need not apply the plain error rule.[23]

Some courts have held that police officers who arrest a citizen without probable cause are not civilly liable for false arrest so long as, at the time of arrest, they had a reasonable good faith belief that their conduct was proper.[24] However, even those courts

18. After filing of the three briefs provided for in Appellate Rule 11 and shortly before oral argument, appellants filed a motion to file a supplemental brief. The motion was granted just five days before oral argument was heard.

19. Civil Rule 51(a) provides in part:
No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.

20. See Merrill v. Faltin, 430 P.2d 913, 917 (Alaska 1967).

21. Id. See also Irving v. Bullock, 549 P.2d 1184, 1187–88 (Alaska 1976); Holiday Inns of America, Inc. v. Peck, 520 P.2d 87, 90–91 (Alaska 1974); Malvo v. J. C. Penney Co., Inc., 512 P.2d 575, 584 (Alaska 1973); Nordin Constr. Co. v. City of Nome, 489 P.2d 455, 471–72 (Alaska 1971); Saxton v. Harris, 395 P.2d 71, 73 (Alaska 1964); Gregory v. Padilla, 379 P.2d 951, 955 (Alaska 1963).

22. Holiday Inns of America, Inc. v. Peck, 520 P.2d 87, 91 (Alaska 1974).

23. In view of our decision that there is no reason to apply the plain error rule, we need not decide whether appellants' objections at trial to the probable cause instructions were sufficient to avoid the bar of Civil Rule 51(a).

On this point, see Reader v. Ghemm Co., 490 P.2d 1200, 1202 n. 1 (Alaska 1971), which indicates that an objection with an accompanying inaccurate statement of the law will suffice to preserve an issue for appeal. But see Saxton v. Harris, 395 P.2d 71, 73 (Alaska 1964), in which we stated:

The purpose of [Rule 51(a)] is to enable the trial judge to avoid error by affording him an opportunity to correct his charge before it goes to the jury. The dictates of the rule are satisfied only if the judge is clearly made aware of the alleged error in or omission from the instructions. Counsel's objections must be specific enough to clearly bring into focus the precise nature of the asserted error. (Footnote omitted.)

24. See e. g., Fisher v. Volz, 496 F.2d 333, 348 and n. 27 (3rd Cir. 1974); Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 456 F.2d 1339, 1347 (2nd Cir. 1974); Rodriguez v. Jones, 473 F.2d 599, 604–05 (5th Cir.), cert. denied, 412 U.S. 953, 93 S.Ct. 3023, 37 L.Ed.2d 1007 (1973); Hill v. Rowland, 474 F.2d 1374, 1377 (4th Cir. 1973); Clark v. Zimmerman, 394 F.Supp. 1166, 1176 n. 2 (M.D.Pa. 1975). But see Director General of Railroads v. Kastenbaum, 263 U.S. 25, 44 S.Ct. 52, 68 L.Ed. 146 (1923); United States ex rel. Jones v. Rundle, 358 F.Supp. 939, 949 (E.D.Pa.1974). It is interesting to note that the decision in Hill v. Rowland, supra, the case which emphasizes

have required that the police officers' belief be supported by objective evidence.[25]

We need not decide in this case whether a reasonable good faith belief in the legality of an arrest is a defense to a tort action against a police officer for false arrest or false imprisonment, because we do not believe that there was objective evidence sufficient to support such a belief in this case. The officers who were responding to a report of an alleged rape, did observe a distraught woman standing near the alleged rapist. However, by the time the officers decided to arrest Ailak, they had also seen the woman flee from the police officers; they had spoken with the residents of the house in which the alleged murder victim was reported to be, only to find that there was no murder victim there; and they had spoken with the person who reported the alleged crimes and discovered that he did not know the woman who had told him that Ailak raped her.

Under such circumstances, we do not believe that reasonable police officers would have believed that they had probable cause to arrest appellee Ailak. In this regard, we agree with a statement made by the United States Court of Appeals for the Sixth Circuit:

> The law does not expect police officers to be sophisticated constitutional or criminal lawyers, but because they are charged with the responsibility of enforcing the law, it is not unreasonable to expect them to have some knowledge of it. We cannot permit a police officer to avoid liability for damages by pleading ignorance of the law when he unreasonably . . . oversteps the bounds of his authority and invades the constitutional rights of others.[26]

Based on the foregoing, we conclude that any erroneous statements of law which may have been made by the trial court concerning probable cause, or the standard of liability imposed on a police officer for false arrest, did not prejudice the City. Ailak was arrested without probable cause by officers who had insufficient objective evidence to support a belief that arrest was proper.[27]

### 3. State of Mind.

When Encelewski called the police, he talked to Officer Renard Nichols. Nichols then relayed Encelewski's message to an-

---

most strongly the subjective aspect of the proposed liability standard, relies heavily on the earlier United States Supreme Court decision in *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). In *Pierson*, the Court held that an officer who acts in good faith and *with probable cause to arrest* under a statute later held unconstitutional is not liable under 42 U.S.C. § 1983.

**25.** *Glasson v. City of Louisville*, 518 F.2d 899, 909 (6th Cir. 1975). *See also Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 456 F.2d 1339, 1348 (2nd Cir. 1972). Even the court in *Hill v. Rowland*, 474 F.2d 1374, 1377 (4th Cir. 1973), recognized that the standard it adopted was only "partly subjective." *See* note 24, *supra*.

**26.** *Glasson v. City of Louisville*, 518 F.2d 899, 910 (6th Cir. 1975).

**27.** Since we have concluded that appellee Ailak was in fact arrested, we need not consider the City's point on appeal which asserts that the trial court erred in not instructing that police officers under certain circumstances have a right to detain citizens on less than probable cause in order to investigate reported crimes.

*Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Coleman v. State*, 553 P.2d 40, 45 (Alaska 1976). While it is clear that police officers may stop citizens during such investigations, it remains an open question whether that privilege ever includes a privilege to transport the detainee absent probable cause to arrest.

*See Morales v. New York*, 396 U.S. 102, 105–06, 90 S.Ct. 291, 293, 24 L.Ed.2d 299 (1969), in which the United States Supreme Court specifically declined the opportunity to "grapple with the question of the legality of custodial questioning on less than probable cause for a full-fledged arrest." The defendant in *Morales*, who had appeared at his mother's home for questioning at the request of police officers, was taken to the stationhouse for questioning on less than probable cause to arrest.

Cases which would be helpful to a determination of this issue include: *United States v. Richards*, 500 F.2d 1025 (9th Cir. 1974), *cert. denied*, 420 U.S. 924, 95 S.Ct. 1118, 43 L.Ed.2d 393 (1975); *People v. Harris*, 540 P.2d 632 (Cal.1975); *State v. Byers*, 85 Wash.2d 783, 539 P.2d 833 (1975); *People v. Gatch*, 56 Cal. App.3d 505, 128 Cal.Rptr. 481 (1976).

other police officer, Myron Michaels, who in turn relayed the information to Chief of Police Roger Kennedy.

On direct examination, during the presentation of the City's case, Officer Michaels was asked the following questions:

Q: After you received the call [from Officer Nichols, relating the Encelewski report of the alleged rape and murder], what did you do next?

A: I questioned Mr. Nichols just briefly, one question. I asked him of this—

At that point, Ailak's attorney objected to the statement as hearsay. The City argued that the conversation was relevant because it reflected what the officer's state of mind was at the time. The trial court sustained the objection and excluded the evidence.

Immediately thereafter, Officer Michaels was asked the following questions:

Q: What did you do next after the phone call [reporting the alleged rape and murder]?

A: After I hung up the phone, I hollered out to Chief Kennedy, "There's another one. Let's go." And he said, "What is it?", and I told him there had been a report of a murder/rape, and we were to meet someone at Third and Division. I grabbed the evidence kit, laboratory kit, and the—the camera kit, and we headed for the door.

Q: When you said, "There's another one," what did you mean by that remark?

The trial court again sustained Ailak's objection that the statement was inadmissible hearsay. The City, unsuccessfully, renewed its state-of-mind argument.

The City contends that the trial court erred in excluding as hearsay the testimony concerning Officer Michaels' state of mind at the time of the incident. The City argues that Michaels' state of mind is relevant to a determination of whether the conduct of the police officers was reasonable, and the City offered to prove that evidence relevant to a declarant's state of mind is outside the hearsay rule.[28]

 The reasonableness of a police officer's conduct in conducting an investigation of a reported crime is to be "judged against an objective standard: would the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"[29] The state of mind of the particular officer involved at the time of the incident was not relevant. What a reasonable officer would have believed was the proper inquiry. Therefore, the trial court properly excluded Michaels' testimony, not because it was hearsay as the trial court ruled, but because his state of mind was not at issue and therefore, not relevant.

### 4. Remittitur or New Trial.

 Appellants final point on appeal is that the trial court erred in denying their motion for a remittitur or a new trial. We have repeatedly held that the decision whether to order a remittitur or a new trial is one left to the sound discretion of the trial court. Interference by this court is not appropriate except in the most exceptional circumstances to prevent a miscarriage of justice. We must be left with a firm conviction on the whole record that the trial judge made a mistake in refusing to order a remittitur or grant a new trial.[30]

We are firmly convinced that the trial judge made such a mistake. As we stated earlier in this opinion, there was no justification for the $10,000.00 award for a trespass. We have also held that since false arrest and false imprisonment are not separate torts, there was no basis for awarding $45,000.00 for false arrest and another $45,000.00 for false imprisonment.

**28.** McCormick on Evidence § 249, at 590–91 (2d ed. 1972).

**29.** *Terry v. Ohio,* 393 U.S. 1, 21–22, 88 S.Ct. 1868, 1880 (1968).

**30.** *Haskins v. Shelden,* 558 P.2d 487, 494 (Alaska 1976); *Hash v. Hogan,* 453 P.2d 468 (Alaska 1969); *National Bank of Alaska v. McHugh,* 416 P.2d 239, 244 (Alaska 1966).

Deducting $10,000.00 and one of the $45,000.00 awards from the total damages award of $100,000.00, leaves the sum of $45,000.00 as the damages allowed Ailak for false arrest. This amount, awarded specifically as compensatory damages for the detention of Ailak, appears clearly excessive and without support in the evidence. No evidence of any physical injury to Ailak was presented. Since Ailak was retired, he lost no wages as a result of the emotional distress caused by the incident. The principal evidence of emotional distress presented at trial was the testimony of Dr. Ingle, who had seen Ailak for one or two visits of an hour or less. Even Ingle testified that Ailak would not permanently suffer physical symptoms of depression as a result of the incident. Ailak testified that he expected to be able to forget the incident. On the basis of such evidence, the refusal to order a remittitur of an award of $45,000.00 in compensatory damages for the detention was an abuse of the discretion.

On remand, we direct the trial court to grant a remittitur or order a new trial limited to the issue of damages. Appellees are entitled to no award on the trespass count since we have held that, as a matter of law, the entry into the Ailak residence was privileged. Further, appellees are not entitled to one of the duplicate $45,000.00 awards. Finally, we direct the trial court, if a remittitur is granted and accepted, to determine what part of the remaining $45,000.00 award is excessive in light of the sparse evidence presented of actual damages due to the detention. In making this determination, which we believe should result in an award not in excess of $15,000.00, we assume that the trial court will consider that there was no evidence of malice or of abusive conduct on the part of the appellants and that the jury specifically found that the appellees were not entitled to punitive damages.

REVERSED and REMANDED for proceedings not inconsistent with the views expressed in this opinion.